Good morning, your honors. I'm Alan Hager. I'm a Deputy Attorney General and I'm representing the Lands Commission. What did you say? I'm Alan Hager, Deputy Attorney General, and I'm representing the Lands Commission. I'm getting my hearing aids next week, so... Speak up. And I will... I will... I have a... I have a... We all have these here. Okay, and I'll... Amplifiers. And everything you say is being photographed and... For posterity, eh? For posterity. May they have a long life, yeah. Go ahead. Okay. Well, thank you. This case presents a collision between two very important elements of governmental sovereignty. The federal eminent domain right... Well, that battle's been going on for 200 years. Yes, it has. But I don't think we've had a case quite like this one coming to the appellate court before. We... The United States' position is that essentially you can't have one without... You can't have them both. In other words, in order to preserve and enable the government fully to exercise this power of eminent domain, the state's sovereign rights in the lands must be obliterated. Well, there's no question that in a normal course, when the United States exercises this power of eminent domain, it trumps any competing interests in the land, right? Absolutely. Okay. So the question is, is there an exception when the other claimant is a separate sovereign, in this case the state? Not exactly, no. Let me ask you this. This is what I understand, that the state of California, this is what I understand the state's position to be. Where is this base? Is it by... Well, it's on the road that goes right south to Tijuana? No, it's actually up near above Shelter Island in San Diego City. Above Shelter Island. Yes. Right off Nimitz Boulevard. Right off Nimitz Boulevard. Do you know who Nimitz was? Admiral Nimitz. Sure. And I... From Texas. I should know some of the things he did, but I don't. Well, so the state's position, I believe, is to the federal government, look, you need it, the Navy needs it, and we have no problem with that. The only thing we are concerned about is if you get this full fee title, that there may come a time when the government of the United States no longer needs that base. And we're concerned that it might be sold to some developer who put up condos and, you know, sell them for $5 million apiece. And the government already has. When does the present lease would expire? Almost 50 years from now. And so the state has said, yeah, go ahead and use it. You don't have to pay us. How many millions was the verdict? 29? 2.91, I think. 2.9, yeah. A million. And stay there rent-free. And when the government of the United States decides that it no longer needs that property and it doesn't put it to public use, then the property ought to come back to us because we're the guardians of the coast of California. Everything's fine except for the last thing you said. It isn't really necessarily that the property will come back to the state. It's that the public trust rights will remain on it. And to follow up a little bit. By the public, what's the difference? It's really a land use matter. Somebody could, a private entity could own it and there would be like a public trust right of public use. In other words, it has to be made available. For example. Well, let's restrict it as the private entity. What if the Navy wanted to set up a naval museum on the property? As long as the Navy... Or they brought in, well, not an aircraft carrier because they're North Island, but it brought in some amphibious vehicles so people could see how prehistoric days the Navy operated. As long as the Navy wants the property, the state of California is not having a problem with this. And really, and I would like to follow up. They could put up a naval housing for the sailors. They still have it. It's still their property. The public trust interest does not come into play until after they want to dispose of it to private property owners. Our concern, and I want to follow up with what Judge Tolman said, because the difference here is not because of the state being the owner. The fact is the nature of the lands. That's the whole point of it. So is the state asserting some right, a land use right, to tell the federal government what it will do with its land? Is that the problem? No. The state owns this property. And in fact, the state owns the public trust rights that it obtained as a part of its sovereignty. Prior to or after eminent domain? When it joined the union. It obtained title interest for the people to hold these lands forever for the purposes of essentially commerce, navigation, recreation, for lands whose use should never be taken away from the public. Well, if that were true, then the federal government could never condemn through eminent domain land owned by the state for purposes of building a post office, which I think was the subject of that Supreme Court hearing. Oh, no, not at all. Not at all. Because that's not part of the trust. Exactly. It's not. If it's a trust. Suppose a post office, suppose they wanted to build a post office on this particular piece of property. Fine. It's a federal government purpose. That's carrying out the federal government, the powers delegated in the Constitution to the United States. They can condemn it for whatever federal reason they want. We're not concerned about that. Judge, if I could ask you a question. So do you have any case from any federal circuit that says when the U.S. government condemns a piece of property with eminent domain that the state, and when they do that for a legitimate federal purpose, like they've got the base there, that the state retains a quiescent interest in the property that can be re-invoked years later when the federal purpose changes? The question is do you have any case that's ever held that? No. And the reason is that most, I mean, most all of the eminent domain cases that certainly the United States has cited in its brief are all involving proprietary lands. And there's no reason, and the state is not, California is not claiming that we have any right after eminent, after the use under eminent domain is finished, that we have any right that would come to the fore. It's only because of these unique public trust lands. These are navigable waterways and tide and submerge lands that are subject to the public trust. These sovereign rights, and because of these sovereign rights, and the Supreme Court years ago has said the federal government cannot extinguish these rights. And the point is that if they can't extinguish the rights, and the Constitution says they can't, because the right to extinguish was not delegated, they can't forever extinguish them by eminent domain. So is it the state that decides when the use of the land is a legitimate federal government use? Absolutely not. Well, suppose that the Navy decides it no longer needs the base there, but the government, I guess through the General Services Administration, decides that maybe this would be a good location for publicly financed housing, and so they build a Section 8 housing project there. Would your position be that the Lands Commission would somehow have authority to regulate that project? No. Our point is they can't just extinguish these rights so they're gone forever. In other words, they can't do indirectly what the Constitution prohibits them from doing directly. What I understand your position to be is that if at some point the federal government should decide, since their eminent domain suit was to obtain title in fee simple, that it doesn't need the property anymore, and now it wants to sell the property to the highest bidder, a private party, that that would be the triggering event that you say would bring this quiescent interest back to life. Is that correct? That is correct. And what authority do you have for that? The authority of it is that under the equal footing doctrine, the United States government has no authority to extinguish the public trust rights in the land and convey them away into private property. What we're trying to do is find an accommodation between the two, and that if the federal government can't directly extinguish these rights, they're doing it indirectly by condemning everything out, and then when they don't need it any longer, conveying it into private property. Illinois Central is a good example. You can't take for private use, or here the Illinois legislature, you can't sell the waterfront of Chicago into private hands. If the government decided instead to condemn that property, and then after it didn't need the property, let's say they didn't want the railroad on there anymore, and they sold it, they would be accomplishing what under the equal footing doctrine says they can't do. We're really trying to say, look, these are special lands. These lands are unique. They can't be replicated. And the public has forever a right to use these lands. Which no federal court or act of Congress has the power to extinguish. That they have no right to forever extinguish it. The answer is yes, they cannot extinguish it. Yes, the answer is yes. And how does that square with the supremacy clause of the Constitution? Because the states did not delegate the right to extinguish the sovereign interest in the Constitution. The federal government has rights over these lands, and these rights are primarily their navigational easement, their right to regulate commerce and keep the land open for navigation. There is no extinguishment. There is no right other than that of the government to take these rights away. But you do concede that had the United States, through act of Congress prior to 1850, disposed of this land to a private developer or some private purchaser, that there would have been nothing under the equal footing doctrine to transfer to California on statehood. No, not exactly. Isn't that what the Supreme Court cases say? No, let's see as an example. This is where the issue was when the United States held land that later became Alabama, in trust essentially for Alabama. The court there said the United States Congress could not sell off that property. To say ever, I mean, yes, there's some exceptions, and I think the language in some of the cases are to fulfill an international duty or through some public exigency they could dispose of their rights or extinguish this public trust rights. But no, as long as these are tight and submerged lands and navigable waterways, Congress could not do that. There are some exceptions. There's a case that I cited. It's SEMA Corporation versus the United States where the United States through the treaties confirmed patents in Mexican landowners and that California never objected to that and therefore it couldn't challenge that. But as long as these lands meet the qualification of being tight and submerged and navigable waterways, inland type waterways like in San Diego Bay, that's a perfect example that before the states are admitted and the United States holds them as territories, they can't just sell them off. So Congress would be without power in your view to alienate this property? Correct. But let me ask you this. I have another question for you, Judge Gould. Assuming that we accept your theory, then am I right that the $2.9 million that was awarded, that that figure would go out the window because it assumed that all the rights in the property were extinguished. So the court would have to hold a new trial on the premise that you're arguing? No, because the state did not take a part in the valuation part of the litigation because we don't put any monetary value on the public trust rights. The only thing I see is that when the Navy is ready to sell the land, they have like a property restriction and they can sell it and it's like a zoning order that you can only use it for certain things. They can sell it to some private company. I understand your theory. Let me ask you another question. Assuming we reject your theory for lack of precedent or whatever and the federal government, when they condemn the property, takes full title to it, is the federal government restricted by a federal law public trust doctrine? Now maybe that issue is not presented in this case, right? Correct. No one's asked the court to decide whether if the federal government gets all the property that citizens have some right to restrict the federal government. So we're not asked to rule on that, just on whether the state's rights are extinguished. Yes, that is correct because we do not intend to take – our point is we don't have any authority to tell the federal government how they can use the property once they condemn it. Okay, thank you. Let me ask you this. I'm just curious. Now a lot of that property around Shelter Island, the waterways, well the slot up towards Point Loma has always been there, but Shelter Island and other facilities there, most of that was developed after the war, the Second World War. Yes. And you've got big hotels up there and all that. Now are there restrictions on any of those hotels that are there? Because I remember when all that was was just a big swamp, and then I went back. I spent a year and a half of my life in San Diego Naval Hospital, and I remember when I came back there in the early 50s that I was just amazed at all the changes. I didn't recognize any of it. So was all of that subject to this trust? I don't know exactly where the trust is and the trust isn't. A lot of the land has been filled, and if it's been filled, then yes. Well, most of it's filled. Most of it's filled, and a hotel. A hotel is a trust used. The trust says it has to be for commerce, navigation, fisheries, environmental protection, recreation. So that's commerce. Commerce is pretty broad, and people who are experts in public trust law have arguments as to what is the extent of what you can do. Hotels, for example, are certainly public trust uses. We're not trying to get into here at all. I'm just curious. I would say that if there's a hotel there, it's a hotel. It's fine. The state's not in there regulating what they do with it. What would be prohibited, for example, is private residences where there's no public ability to use the property. That's what we're trying to protect. We're trying to say this land is for public use, not for... Half of San Francisco, maybe not half, is sitting on fill. Right. And what they've done now, years and years ago, a lot of that land was just determined to be free of the trust. For example, if you go on the landward side of the Embarcadero, that's all considered to be non-trust lands. The bayward side of the Embarcadero is public trust lands, and you have a ballpark on some of that, too. Counsel, Judge Gould, if I could interject just for a second, please, because something you said prompts this. Do I understand correctly that the California State Legislature is able to extinguish public trust land? Yes. Okay, then my question is, if that's true, then how is it that your client can take the position that the California Legislature can extinguish public trust rights, but the federal government could not? The cases that I've cited, including and especially Illinois Central, do provide that there is a point that legislatures can, in managing the lands, they administer the trust, they can convey the land into private hands to further some other trust purpose. Not widespread sale of the land like they did in Illinois Central, but lands over the years, and in California, as an example, lands have been filled, they're no longer really useful for public trust purposes, and some are sold. But the reason is that the states, upon their admission to the union, became the administrators of the trust. They're the ones that hold the trust. The federal government doesn't hold it anymore. The federal government gave it to the state, and the states retained those rights when they were admitted to the union, and the United States is not the trustee. It doesn't have any administration rights over that. Yes, the Supreme Court has put limits on what the state legislatures can do. California is, certainly today, one of the ones that is the most careful guardian of the public trust rights, and maybe that's why we're here. But the fact that some legislatures have done it in the past doesn't mean that there's some wholesale ability of state legislators to do that. I cited a case involving Loyola and Northwestern with respect to selling some portions of Lake Michigan to the university, and essentially the case said two wrongs don't make a right because they did it for Northwestern, they could not do it for Loyola. Did I answer your question? Yes, you did. Thank you. Go ahead. You're over your time. Thank you. May it please the Court. My name is John Arbab. I'm with the Department of Justice, appearing on behalf of the United States. Excuse me, I have a bit of a cold this morning. I think maybe the best way for me to jump into this is in response to a question that Judge Tallman put to Mr. Hager concerning what really is his authority for this notion that the public trust becomes quiescent while the Navy uses this property but then reemerges later if the Navy should ever transfer the property. Well, you know, one of the first things I learned in law school is that the law is replete with fictions. So what's wrong with this one? Well, Your Honor, I think the problem is that Mr. Hager responded that his authority is the equal footing doctrine, and I just don't think to the extent that the equal footing doctrine is fiction, which it may be, I just don't think it can carry the burden that the State would put on it for the reasons that the Supreme Court has already said pretty clearly. In fact, in Pollard's lessee, the Supreme Court, I believe that's the case, in 1845, when the Supreme Court first enunciated this equal footing possible fiction. But the Court said, although there is this equal footing principle, such that later admitted states are admitted on equal footing with the original 13 states and therefore acquire title to the navigable waters and soils under them, just like the original 13 states did, there's a big qualification put on that by the Court, which is that those rights are, quote, subject to the rights surrendered by the Constitution to the United States. So even within the context of the equal footing doctrine, whatever else the equal footing doctrine stands for, it has this large exception for rights surrendered by the Constitution to the United States. And I don't see how there can be really any debate that eminent domain rights were surrendered to the U.S., the right to provide for the- No mention about eminent domain, though. Well, it's a very general statement, Your Honor. Eminent domain rights, I think, would fall into that. But certainly the constitutional right in Article I given to the federal government to provide for the common defense, to provide for and maintain a navy, those are explicit rights granted by Article I to the federal government. And I don't see how, under the articulation of the equal footing doctrine in Pollard's lessee, I don't see how there can be much room for argument that whatever states are granted by virtue of the equal footing doctrine can be trumped by rights vested in the federal government. I'm just getting you ready for your Supreme Court argument. Well, hopefully it won't come to that, Your Honor. I'm afraid the Solicitor General would take over at that point. Counsel, you never know about that, but let me ask you this. Assuming that you prevail and the government gets the property without state rights still being quiescently attached to it, is the federal government subject to any federal law of public trust doctrine if they go to sell the property? Are there cases that decide one way or the other if there's any restraint on the federal power with land it owns? Your Honor, I know your question is about federal law. If I could back up just one moment. I think the concern here is what would happen to this land if the government ever decided to sell it? Right. That's why I'm asking. I know the federal law question isn't directly presented in this case, but if we're trying to look at the impacts on society, I wanted to know if their environmental interests would hem in what the federal government might want to do. Well, yes, Your Honor. If it was sold the property. Yes, Your Honor. In fact, I believe when the Naval Training Center, which is just across Harbor Boulevard from the Anti-Submarine Warfare Training Center, when that property was closed through the BRAC process back in the 1990s, the federal government had to go through environmental review under the National Environmental Policy Act, an environmental impact statement had to be prepared. So those sorts of things would still come into play. Also, the city of San Diego was able to participate in that process, was able to decide what types of land uses, what sort of zoning regulations should be applied to that property, and so on. So the state does have, in the event of this hypothetical sale to a private party, has authority to use its traditional land use authority, zoning regulations, and so on, to decide how the private parties will be able to use the land. And Judge Gould, with regard to your specific question about federal public trust, most of this land here at issue is fill, but there are approximately five acres that you can see on the maps we provided that are not fill, that are still water, still covered by water. And so to answer Judge Gould's question, I think it would be true that in the event of a future sale, the part of this property that can be used for commercial passing of vessels, and so on, would still remain subject to the federal navigational servitude that the Supreme Court has recognized in some of the 19th century cases that we've cited, that the state has cited. But I think Mr. Hager's position is that at that point, the Lands Commission would step forward in reliance on its public trust rights, and it would dictate to the federal government what a suitable future use would be for the property. That's when his quiescent right sort of... I can't remember from my real property class whether it's shifting or springing use or... Please, let's not go there. That doesn't apply here. Well, I think that that is Mr. Hager's position, and I think it's even more troublesome than that because Mr. Hager's position would not just... Mr. Hager's rule would not just bring the state public trust interest back into life in the future when the government decides to sell the property if it does, but it would have impacts today because if you look in the state's reply brief, I think it's on page 2, the state is very careful to say that this public trust would remain quiescent so long as the Navy uses this property for purposes that the state believes fall within military purpose or another legitimate federal purpose. But should presently the Navy cease to use the property for such purposes, the state's interest would spring back to life and the state could come in at that point tomorrow and say, no, you're planning to build something on this site. You're planning to use... Well, that's why I asked him the question about Section 8 housing because that's federally funded but privately constructed and operated subject to HHS, HEW restriction. Right. Your Honor, I think that would be a problem because the state would still be maintaining sort of a hook, you might say, although it says that its right is quiescent presently. Well, since that's residential use, I assume his position is that the State Lands Commission would say you can't do that. Potentially, yes, Your Honor, and that's a serious concern for the Navy for obvious reasons, and that is part of the reason why in this particular eminent domain... What are the obvious reasons? Because the Navy would not want the state potentially coming in now and for however long it holds the property, second-guessing the Navy as to what uses are proper and potentially embroiling the U.S. government in litigation over that as occurred in the Broadway case that is mentioned in the briefs. If we ruled in the state's favor, what impact would that have on the $2.91 million judgment entered in favor of the Port of San Diego? Well, I take it from Mr. Hager's presentation that it would not have an effect on that. I'm not sure that's right, though, because if he's correct, then presumably that valuation was based on the fair market value of the property, assuming that it could be used for some other commercially appropriate reason. So if he's right, then that land is not worth as much as the district court thought it was worth when it entered judgment in favor of the Port. Well, Your Honor, the federal government has no quarrel with the amount of just compensation that it was ordered to pay, and the state has not raised any valuation argument. Actually, the money was paid pursuant to a stipulation by the Lands Commission, a stipulation between the Lands Commission and the San Diego Unified Port District. They stipulated that whatever judgment was rendered by the jury would be paid to the Port District, and the Port District has not filed an appeal saying that $2.91 million was too low. Well, I'm suggesting they'd get less, because this is a restriction on the use of the property, which presumably affects its valuation. Well, as I understand, Judge Tallman is saying, if you lose on this appeal, then maybe they should get less money, which is what I was raising earlier for this exact same reason. But I realize you're advocating that the government should prevail on this appeal. Yes, that's correct, Your Honor, and there was a specific... You're saying that the government doesn't object to the $2.9 million if the state's rights are extinguished. Yes, Your Honor, that's correct, and there was a specific order issued by the District Court some year and a half after the order that's at issue here, and I believe it was an October 2008 order. I believe it's docket entry 43 on the District Court docket sheet, where the District Court addressed the question of how would this alleged Tidelands trust interest be valued, and if I'm remembering correctly, the District Court concluded that under Fifth Amendment takings law, the interest that the state was asserting fell under the category of a non-pecuniary interest, which under Fifth Amendment takings law is not the type of interest for which you can be compensated. So it seems to me that if the state or the port district had a quarrel with how this land was valued for purposes of just compensation, it should have challenged that order and any other related order of the District Court that went to valuation. But the only thing before this court is... I think we understand your position on that. I guess I want to go back. Mr. Hager, I think, took the position that the states never surrendered their rights under the Constitution. What's your response to that? Yes, they did. Why? Well, Your Honor, I would go back to what we were discussing earlier, Pollard's lessee and other cases. It's pretty clear to me that the states surrendered all of the rights that are enumerated in the federal Constitution. And as a matter of the Supremacy Clause, those are the paramount source of law here. And the federal government's ability to take whatever interest it needs in property by eminent domain was surrendered to the U.S. government. If there's any question about that, the Supreme Court cases talk about any authority, any jurisdiction that the federal government was vested with by virtue of the Constitution. And that would certainly include Article I powers to provide for the common defense, to provide for and maintain a navy. And those are all things that the states surrendered upon adoption of the Constitution. And those support the government's exercise of authority here. Is there a case that supports that position, that's on the books? Well, I think it's clear from Pollard's lessee, from the Shively case, Shively v. Bowlby, 1894. More recently, the Coeur d'Alene tribe case that Mr. Hager cites in his brief from 1997. So, I mean, in all of these cases, the Supreme Court has repeated the principle that although the states have these sovereign interests in this type of land, title land, the states' interests in those types of lands are subject to the rights vested in the federal government by the Constitution. And that's really the basic principle that we believe decides this case. But the Supreme Court appears to be moving in the direction of respecting states' rights. We have some of that, too, haven't we? Well, I think it's fair to say that the Supreme Court is concerned about federalism generally and that in a particular case, depending on the interests that are at stake, federalism principles could result in the conclusion that the state has certain retained rights that were not given to the federal government. But this is clearly not, to my mind, that sort of a case. As I understand the state's position, they are not arguing, for example, that there's a, for instance, a Tenth Amendment type of right that they have that supports this quiescent public trust idea. The Tenth Amendment, I believe, is usually invoked when the state is relying on a federalism concern and saying that the United States government has overstepped the constitutional limits. That's not the state's position here. It's really, as I see it, the Equal Footing Doctrine, which doesn't help the state for the reasons I've mentioned, and also the Public Trust Doctrine and Illinois Central, that line of cases, which I don't believe helps the state because, as discussed in the brief, Illinois Central in that line of cases is articulating a limit on state authority to alienate this type of land. It doesn't address, it really doesn't have anything to do with the authority of the federal government to take this type of land in eminent domain. So the Public Trust Doctrine might be relevant if someone were saying, California has overstepped its authority in alienating this property to someone else. But that's a completely separate question from whether the federal government had authority to take this property by eminent domain, including the public trust right. If I could just make one other point, I don't know if the Court will find this helpful, but to my mind, in analyzing this case, it helped me to realize that although this is, although the public trust, state public trust interest is sort of hard to get a handle on in terms of what exactly is it. The California Supreme Court has stated on many occasions, and we discussed this in the brief, that this interest is an easement. The California Supreme Court said that as far back as the California Fish Company case in the early 1900s. Later on, it said the same thing in a case called Mansell, City of Long Beach versus Mansell. And the U.S. Supreme Court, in the Summer case that Mr. Hager mentioned, understood the California public trust right to be an easement. And so at least to my mind anyway, it seemed to help explain why this interest can be extinguished and taken by the federal government in an exercise of eminent domain power. Because an easement generally is something that we think of as being condemnable and takeable, for want of a better word. So although it has sort of a, it's not that easy to get a handle on what exactly this concept is. The California courts have called it an easement. And I think viewing it that way, it's not that difficult to come to the conclusion that it can be taken and extinguished just like any other easement in property would be. So unless the court has further questions, I would just urge that the judgment be assured. I have no questions here. No, thank you. No. Thank you, Your Honor. Thank you. Thank you. Thank you. I would like to respond to two things. One, with respect to Section 8 housing that you brought up. Our point is that as long as the government holds the property for something that they are doing pursuant to their delegated powers, the trust rights do not reappear. Well, I may be totally wrong, but let's assume for purposes of my Section 8 hypothetical that it would not be the federal government. It would be a federally financed public housing project, but it would actually be owned and developed by a private enterprise. Okay. Subject to restrictions by the health and what is that? The housing department, HUD or whatever it's called. Okay. If the federal government were to sell it to the private entity that would develop it, then yes, the public trust right, under our theory, the public trust right. You would say in that case to Congress, no, you can't do that. No, you can't do that because you don't own the property anymore. You, the federal government, you're selling it. When you're selling it, the threat rights reemerge. So, yes, you can't do that. Well, what if the federal government decides that it wishes to have some very nice housing for the enlisted personnel and they want to build some beautiful apartments with a good view of the bay and inserts in the, when Section 8 is used, that it shall be used solely for housing of naval personnel? As long as the lands were not sold outright to a private party but were leased, it would be fine. If it's leased, it'd be fine. Yes. I'll use an example of what I'm trying to... You could give a private party a long-term lease. You could give the private party a long-term lease. For example, Stanford University has, under the founding grant, they cannot sell any of their lands, but they have faculty housing on campus and they're all under long-term lease. That type of situation, I think, and with what we're looking at, you can't forever, the federal government can't sell away and by doing so extinguish the public trust rights. So, yes, if they had... So, if Congress... Under your theory, if the federal government wants to do this or that 20 or 30 years from now, the fine-tuning of what it can do, that's up to the California Lands Commission, not up to the federal government. No. No, not at all. All we're saying is when they sell it and they no longer own it... Right. If they want to sell it, then it's up to the Lands Commission and the state of California to regulate it, but if they lease it, they can keep control over it. That's correct. If they sell it, it's like having a zoning ordinance, say, of the city of San Diego come into play and say this is what you can do with the property and this is what you can't do with the property. Okay, so we just built a new United States courthouse in Great Falls, Montana, but the land isn't owned by the federal government. It was a build-to-suit arrangement in which the General Services Administration essentially encouraged a local developer to build a building that would be suitable for federal court purposes, and we lease the property back for purposes of using it as a United States courthouse. Your position would be if we decided to do that on this piece of land, the Lands Commission could tell us, no, you can't do that. Yes. Yes, but if Congress and its internal wisdom... But you wouldn't find any tightly submerged lands in Great Falls, Montana. Well, you might be surprised. Whether the Missouri River is navigable is a decision we'll reach in a different case, but I think there's a dam or two in the way. But if the government were to decommission the naval base but then erect at federal expense, continuing to hold title, a new courthouse in San Diego on that property, the Lands Commission would be fine with it. Yes. Okay. Thank you very much. Okay, thank you. We're thinking of the future, too. Right. All right. That's it. This matters.
judges: Pregerson, Gould, Tallman